CMR

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

19    2952

DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: 1405 Mill Creek Dr. West Chester, PA 19380

Address of Defendant: 450 S. Easton Rd. Glenside, PA 19308

Place of Accident, Incident or Transaction: _____

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☒

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 7/8/2019    *Attorney-at-Law / Pro Se Plaintiff*    _____
                                                          *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.  Federal Question Cases:**

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☒ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

**B.  Diversity Jurisdiction Cases:**

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, John Devenney, counsel of record *or* pro se plaintiff, do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: 7/8/2019    *Attorney-at-Law / Pro Se Plaintiff*    _____
                                                          *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*



CM R

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

John Devenney        :        CIVIL ACTION

v.        :

Arcadia University        :        NO. **19   2952**

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)   In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)    ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.    (✗)

_7/8/2019_
**Date**               _John Devenney_
                                    **Pro Se Plaintiff**

_484-888-3612_                                   _JTD2983@gmail.com_
**Telephone**                **FAX Number**                  **E-Mail Address**

(Civ. 660) 10/02

CMR

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DEVENNEY | : | |
| Plaintiff, | : | Civil Action No. __19__   __2952__ |
| v. | : | |
| ARCADIA UNIVERSITY | : | |
| Defendant. | : | |

### COMPLAINT

1. Plaintiff is John Devenney, who resides at 1405 Mill Creek Dr., West Chester, PA, 19380.

2. Defendant is Arcadia University, with its main campus at 450 S. Easton Road, Glenside, PA, 19308.

3. Plaintiff is a former Arcadia University student whose request for readmission into the Arcadia University Physician Assistant Program was denied by the Program's Academic Review Committee.

4. Plaintiff has Attention Deficit Hyperactivity Disorder (ADHD), a disability that is protected under the Rehabilitation Act 29 U.S.C § 701 and the Americans with Disabilities Act (ADA) 42 U.S.C. § 12101.

5. Prior to beginning the Physician Assistant Program, in May of 2016, Plaintiff informed Arcadia's Department of Disability Support Services that he has ADHD, although no accommodations were needed at the time.

6. With the knowledge of Plaintiff's condition, Arcadia admitted Plaintiff into the Physician Assistant Program and accepted his tuition payments, totaling approximately $90,000.

7. Through December of 2017, Plaintiff met expectations in the Program. Plaintiff successfully completed the didactic (classroom) portion of the Program in May, 2017, and commenced clinical rotations shortly thereafter.

8. Plaintiff was in good standing with the Program notwithstanding that in June 2017, Plaintiff's father, with whom Plaintiff was very close, suddenly had a massive stroke and died.

9. Plaintiff never had any disciplinary action taken against him at any time during the Program prior to his dismissal.

10. As of December 2017, Plaintiff never had failed or been required to repeat a course, and Plaintiff had been getting consistently good evaluations from his preceptors up until that point.

11. In late December of 2017, Plaintiff's physician started him on a new but similar medication for his ADHD with the intent of improving symptom control while mitigating side effects. Patient began taking this medication at the beginning of his rotation in January of 2018.

12. During his rotation in January of 2018, Plaintiff suspected that his ADHD symptom control was inadequate. However, several factors dictated that it was appropriate to take time to adjust to the medication.

13. At the end of January of 2018, a preceptor contacted Arcadia with concerns about Plaintiff's performance. Arcadia met with Plaintiff on January 25, 2018, and discussed these concerns.

14. At the time Plaintiff suspected that the new medication was to blame, and contacted his physician several times over the next two weeks to schedule an appointment and attempt

to correct the problem, but was unable to meet with his family physician and make the necessary adjustment.

15. One of Plaintiff's problems in scheduling an appointment with his physician lay in the fact that his rotations (one in Lancaster, and one in Dover, Delaware) took him as much as 1 ½ hours from his physician's office, and began early in the day and ended late.

16. When it became clear that an appointment would not be possible, Plaintiff attempted to get the medication adjusted over the phone.

17. Plaintiff's physician did not adjust the medication over the phone as the plaintiff had requested, and instead kept the dose the same. As a result, the plaintiff continued to have poor ADHD symptom control.

18. Plaintiff was called in for another meeting on February 12, 2018, and was summarily dismissed from Arcadia University Physician Assistant Program.

19. During the February 12 meeting, Plaintiff was given a letter dated February 11, 2018, from Dr. Nancy Rosoff, Acadia's Dean of Graduate and Undergraduate Studies, notifying him that he was dismissed for failing a single rotation and "repeated violations of professionalism." The February 11 letter stated that Plaintiff had six months to appeal the decision. (See February 11 Letter, attached hereto as Exhibit "A").

20. Plaintiff discovered shortly after his dismissal that the new ADHD medication was much too slow to take effect in the morning, and was also dosed much too low in comparison to his old medication regimen. His physician had not previously informed him that the medication change was effectively a large drop in his overall daily dose.

21. On April 13, 2018, email correspondence between Dr. Noller and Plaintiff regarding the appeal process (attached hereto as "Exhibit "B") showed that "Readmission is not

guaranteed; the student must demonstrate an understanding of the obstacles they encountered and a realistic plan for future success," and that, "If the committee does not grant you readmission, you can appeal at the University level. There is no further appeal from there."

22. On April 23, 2018, in accordance with the requirements from the Program's Student Handbook, cited by Dr. Noller in her April 13 e-mail, Plaintiff submitted a written request for readmission into the Program (the "Request", attached hereto as Exhibit "C").

23. In his request for readmission, Plaintiff informed the PA Program Academic Review Committee that the sudden drop off in Plaintiff's performance beginning in January of 2018 was in fact due to a medication dosing error on the part of his doctor.

24. Plaintiff contends that with this letter, he was overwhelmingly successful at demonstrating both an understanding of the obstacles he faced and a realistic plan for future success.

25. It was Plaintiff's reasonable expectation that formally advising Arcadia of the challenges he encountered with treating his ADHD and that those issues had been resolved would result in his readmission into the program.

26. By letter dated May 23, 2018, from Dean Rosoff, (attached hereto as Exhibit "D"), Plaintiff was informed that his petition to be re-instated into the Arcadia University Physician Assistant Program had been denied.

27. Additionally, contrary to Dr. Noller's April 13 email, which stated: "if the Committee does not grant you readmission, you can then appeal at the University level," in her letter dated May 23, Dean Rosoff stated: "there is no further option for appeal."

28. After receipt of a demand letter from the plaintiff, the Defendant responded with a concession that Plaintiff was improperly denied a right to an appeal, and offered the appeal on the University level (Attached hereto as "Exhibit "E"). This appeal was also to be in writing only, with no chance for any in-person proceedings.

29. Arcadia subsequently refused to meet with the plaintiff or to include an in-person component to properly review this matter.

30. On September 7, 2018, Plaintiff received a letter from Dr. Noller outlining the reasons for his dismissal (attached hereto as "Exhibit F"). In this letter, Defendant barely mentioned the medication change, and even appeared to contend that it was irrelevant.

31. The medication change was not irrelevant. ADHD is the most responsive disorder to medications in all of psychiatry. If dosed appropriately, stimulant medications are known to completely normalize ADHD symptoms while they are in effect.

32. On November 26, 2018, Plaintiff filed an appeal at the University level.

33. On December 17, 2018, plaintiff received notification that his University level appeal had been denied (attached hereto as exhibit "G").

34. Instead of providing a reasonable accommodation to Plaintiff for the temporary issues he had as the result of a medication dosing error on the part of his doctor, Arcadia has chosen to punish him and take away his livelihood.

35. A deliberate decision not to consider physician error that caused the performance problems that led to the Plaintiff's dismissal have screened him out by reason of his disability.

36. As a result of Arcadia's actions Plaintiff has sustained actual damages, including lost past and future earnings, $90,000 in lost tuition payments to Arcadia, and attorney's fees.

37. At the time of his dismissal, Plaintiff had completed approximately 80% of the Program requirements, paid Arcadia approximately $90,000 in tuition and fees, and invested two years of his life in the Program. All told, including Plaintiff's 63 post-baccalaureate prerequisite credits, his work as an EMT and Emergency Department Technician, and his Arcadia experience, Plaintiff has invested 6 years of his life and more than $150,000 to gain entry into the Physician Assistant profession.

38. By its actions, Acadia acted with a thoughtless, deliberate indifference towards the plaintiff and his disability, allowing a temporary and immediately correctable problem with medications to bar him from entry to his chosen profession.

39. For all of the forgoing reasons, Plaintiff is entitled to the relief requested hereinafter.

## Count I – Violation of the Rehabilitation Act

40. Plaintiff John Devenney incorporates by reference the averments in Paragraphs 1-39, above, as though set forth here at length.

41. The acts described above by Arcadia University and its agents and employees, violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

42. As a result of Defendant's violation of the Rehabilitation Act, Plaintiff has sustained monetary loss, emotional distress, attorneys fees and litigation costs.

**WHEREFORE**, Plaintiff prays for:

    A. Entry of judgment against Defendant, Arcadia University for compensatory damages together with litigation costs according to the proof.

## Count II – Violation of the Americans with Disabilities Act

43. Plaintiff John Devenney incorporates by reference the averments in Paragraphs 1-43, above, as though set forth here at length.

44. The acts described above by Arcadia University and its agents and employees, violated the Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181-12189.

**WHEREFORE**, Plaintiff prays for:

A. Entry of an affirmative injunctive order directing Defendant, Arcadia University immediately to reinstate Plaintiff in the Physician Assistant Program.

## **VERIFICATION**

I, John Devenney, verify and affirm that the statements made in the foregoing pleading are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities.

Date: _7/7/2019_

_John Devenney_
John Devenney

# EXHIBIT "A"



February 11, 2018

John Devenney
1405 Mill Creek Drive
West Chester, PA  19389A

Re: Academic Review
    PA570 Core Elective

Dear Mr. Devenney,

The Arcadia University Department of Medical Science has informed me that you have been dismissed from the Physician Assistant graduate program for failing the above referenced rotation and repeated violations in professionalism.

If you wish you have six months to appeal this decision.  Please submit your request, in writing, to the Director of the Physician Assistant program with a copy to me.

We regret the necessity of this decision and wish you every success in meeting your future educational goals.

Sincerely,


Nancy Rosoff, Ph.D.,
Dean, Graduate and Undergraduate Studies

Cc: Diana Noller, Director, Physician Assistant Program
    Bill Elnick, Registrar
    Scott Rosen, Business Office

# EXHIBIT "B"

Devenney, John <jdevenney@arcadia.edu>

## Appeal

**Noller, Diana** <nollerd@arcadia.edu>                                          Fri, Apr 13, 2018 at 8:14 AM
To: "Devenney, John" <jdevenney@arcadia.edu>

Dear John,

The process is not considered an appeal process, but rather a request from you for readmission.  I will paste the excerpt from the Handbook so that you have that information.  This is the process that I explained during our last meeting that results in approx 40-50% of dismissed students being readmitted to the Program.  In what phase they are readmitted is determined by the PA Academic Review Committee.

If the Committee does not grant you readmission, you can then appeal at the University level.  There is no further appeal from there.

Here is the excerpt from the Handbook:

i.      **Readmission:**

The PA Program does not admit students with advanced placement. However, students who have withdrawn or have been dismissed from the program may be readmitted and granted credit for some or all of the courses that they have successfully completed. This process begins with a student request for readmission which must be submitted to the Program Director no later than **six months** after the date of their dismissal or withdrawal.

This request must include an explanation of the reasons that led to dismissal or withdrawal and an articulated plan for overcoming obstacles to future success. The request is evaluated by the PA Program Academic Review Committee and a decision is made regarding granting readmission. If the decision is made to readmit,  the PA Program Academic Review Committee develops a readmission plan after careful review of the student's academic record. Plans for remediation address numerous factors including grades, continuity of the academic experience, cohort support and other pedagogical concerns. The plan is presented to the student requesting readmission. If all parties agree to the terms, an agreement is drawn up and signed by the student. Readmission is not guaranteed; the student must demonstrate an understanding of the obstacles they encountered and a realistic plan for their success as determined by the PA Program Academic Review Committee, which includes the Program Director.

Any student who is readmitted to the Program will be placed on academic probation as a condition for readmission. The readmitted

student will remain on academic probation at the discretion of the PA Program Director.

Your request needs to come to me via email in the form of a letter.   Please let me know what questions you have.

Regards,

Dr. Noller

**Diana Noller, DHSc, MSPT, MMS, PA-C**
Chair, Dept. of Medical Science
**PA Program Director**
**Arcadia University**
**215-260-4416**
nollerd@arcadia.edu
[Quoted text hidden]

# EXHIBIT "C"

April 23, 2018

Dr. Noller,

I am writing to request my readmission into the Arcadia University Physician Assistant Program. There were significant mitigating factors that impacted my performance on rotations #8 and #9 that the faculty could not have known about. Most significantly, I started a new medication for my ADHD just before I started rotation #8, which is responsible for the constellation of problems that I had from then until my dismissal. Additionally, in my search for an explanation for what happened during this time, I also found significant problems with the medication regimen I used throughout PA school. I have been able to fix these issues with a new dosing schedule for my medications. This will resolve the problems that were seen with me with regards to both academics and professionalism throughout the program.

Just before I began rotation #8 with Dr. Vollmar, I started a new medication for ADHD called Mydayis. I made a change at this time because I experienced challenges with adapting my previous Adderall regimen to meet the various demands and constantly changing circumstances presented by the program. I was able to cope with these challenges to get by up until that point, but I was searching for a solution that would allow me to thrive. In December, my doctor recommended Mydayis. For several reasons, it sounded like Mydayis had the potential to be the answer I was looking for. I filled this prescription on 12/28/2017. My first time taking it for a rotation day was on the first day of my rotation with Dr. Vollmar on 1/2/2018. Unfortunately, it did not work as expected. It was both under-dosed and released far too slowly into the body to meet my needs. My symptom control markedly regressed, leading to a whole constellation of problems with both my performance and with meeting the professionalism expectations of the program. Although I was aware that I was having trouble with attention control, I allowed for a reasonable trial period at the request of my doctor to ensure that the difficulties I was having were not attributable to other factors. Once it became clear that an adjustment was needed, there was unfortunately a significant delay in working with my doctor to make that adjustment. In the mean time, my symptoms remained poorly controlled and directly led to my dismissal. My performance during this time is only reflective of my ability level on an inadequate medication, and is a very poor predictor of future performance.

The problems I experienced with Mydayis led me to examine the pharmacokinetic profiles of my medications in search for an explanation for what happened. Through this, I discovered significant problems with both Mydayis and the Adderall regimen I used throughout PA school. Specifically, neither regimen steadily maintained the medications at therapeutic concentrations throughout the day.

When I first started PA school, I was taking an Adderall regimen. This consisted of a dose of Adderall XR in the morning, and a second, equivalent dose of Adderall IR in the late afternoon/evening. This is the regimen I used for the first 16 months of PA school. There were two main problems with this regimen. First, it did not last long enough. If I took my morning dose first thing when I woke up, I found that they did not last long enough into the evening to enable me to get all of my work done. This led me to delay taking my first dose until I left for class in the evening. This meant that although my medications could not help me with my morning routine, I gained an extra hour of study time in the evening. However, due to the severity of my symptoms, it became clear that I could not afford to be uncovered by medications for my morning routine, as I eventually ran into trouble with punctuality with this solution. In November, after the faculty spoke with me a second time regarding this issue, I began taking them as soon as I woke up. This solved the problem, as no more problems with punctuality arose for the remainder of the year. The punctuality issue was a product of the challenges I experienced with the limitations of my medications at the time. It will not be an issue with a solution that ensures that I can take them as soon as I wake up in the morning.

Second, my detailed look at the pharmacokinetics of this regimen made it clear that the concentrations of the medication varied drastically throughout the day, which explains several academic challenges I had. My morning dose of Adderall XR was a bit too low for me to meet demands. I also did not realize how slow Adderall is to clear from the body. As a result, when I took my evening dose of Adderall IR, very little of my morning dose had cleared from the body. Additionally, Adderall IR *is more*

potent, as it releases all of the medication all at once, in contrast to Adderall XR's time-released formulation. These two factors combined to cause a significant increase in my medication levels in the evening. As a result, my ability levels in the morning/afternoon and evening were significantly different. This explains why I often had trouble getting started with studying productively far enough ahead of time to consistently do well on tests. I would often struggle with productivity in the morning and afternoon, but became much more productive after taking my evening dose. I was able to cope with these challenges to get by, but without a consistent mind to work with throughout the day, I was unable to thrive.

The fact that my morning dose was too low eventually became clear on rotation #4 with Dr. Kessel. This was the first rotation that required me to chart. Charting is a difficult task with regard to attention control. It requires that I synthesize multiple pieces of information regarding a patient encounter and organize them into writing. I initially struggled with attention control, and realized my productivity was suffering. During didactic year, I could compensate for this deficiency during the day by doing most of my work in the evenings, but at this rotation site, I could no longer delay doing my work until the evening. In response, I made a change on Monday of the 4th week of the rotation. I took a slightly higher dose of my medication in the morning, and took a smaller maintenance dose in the evening. Dr. Kessel was impressed with the immediate improvement I made, and asked me what was different by mid-week. During this conversation, he even asked me if I had ADHD out of the blue, as he suspected that ADHD symptoms were to blame for my previous struggles on that rotation. I was impressed. I told him my story, and how the dosing change to my medications was responsible for the improvement. He was happy with the improvement I made by the end of the rotation and noted that on my evaluation.

I decided to keep the changes to the dosing of my medications. I noticed I was sleeping better as well, and that side effects went away. I continued to do significantly better on rotation #5 with Dr. Dave and rotation #6, Emergency Medicine at Lankenau. My evaluations were excellent during this time. I felt relieved, as I finally had the consistent ADHD symptom control to allow me to comfortably meet the demands of the profession. All in all, this was the best solution for symptom control I found, and my performance during this time is strong evidence that improved performance is achievable with changes to the dosing of my medications. This regimen became the basis of my new dosing schedule that I will use moving forward. After looking at the pharmacokinetics involved, it makes sense, as this led to much more consistency in medication levels throughout the day. Unfortunately, although I knew how to reach therapeutic concentrations early in the day, I did not yet know how to best maintain them, especially for extended hours. This problem became apparent on rotation #7 and led to the decision to try Mydayis.

Mydayis was expected to help me attain therapeutic concentrations early in the day and maintain them for 16 hours with just one pill. However, the pharmacokinetic profile shows that it is not that simple. Even if the dose were correct, it would only have started to approach therapeutic concentrations at approximately 6 hours after ingestion. I cannot afford to wait that long. Much of my time working with both Dr. Vollmar and Nicole Fisher was within that first 6 hours, when the medication was most inadequate. In addition to its slow release, Mydayis was also under-dosed by a significant margin. The combination of these factors quickly led to a broad range of problems. On rotation #8, my difficulty with charting and productivity reappeared. On rotation #9, my problems with punctuality reappeared. I also struggled to filter out distractions from the outside world, which I am typically able to do when better medicated. Several other problems also emerged. All of these problems are typically resolved by medications when they are dosed appropriately. The slow onset of effects from Mydayis was not expected, which made it challenging to explain the difficulties I was having and determine what adjustment was needed to resolve the issue. Information on such a new medication was limited. When problems with medications arise, it is important to take some time to problem solve and ensure that the problems are not attributable to other factors, because they often are. These medications can absorb differently on different days based on the acidity of the stomach and other factors. Depression can often mimic ADHD symptoms. The feedback I received by the end of rotation #8 made it clear that a change was needed. Unfortunately, there was a series of delays in working with my doctor to make an adjustment. In the mean time, the medication remained inadequate, and without the ability to think clearly, I made a chain of errors in judgment on rotation #9 that led to my dismissal. The problems I had during this time period are all very typical of under-treated ADHD.

With a better understanding of the problem, I was able to fix it. I presented this information to my doctor and worked with her to create a new dosing schedule for my Adderall regimen, which allows the medications to reach therapeutic concentrations quickly in the morning and be steadily maintained throughout the day. It is based on the change I made on my rotation with Dr. Kessel that led to a period of improved performance on my next several rotations, but it accounts for the problem that remained with maintaining therapeutic levels throughout the day, particularly for long hours. I am very confident in this new dosing schedule, and believe that for the first time, my symptom control leaves nothing to be desired. Since it can be adjusted for long hours, it allows me the flexibility needed to meet any set of circumstances. I can now take my medications when I first wake up in the morning without fear of them wearing off before the last task has been completed at the end of the day. As a result of much more consistent symptom control throughout the day, I expect to finally be able to thrive.

Regardless of the fact that I was inadequately medicated when I was on Mydayis, the bottom line is that I did not perform up to expectations and made mistakes during this time period. While I believe that inadequate control of my ADHD symptoms played a big part in all of the mistakes I made, I take full responsibility for everything that happened during this time. I believe that the problem was with me and with nobody else, and it needed to be addressed before I could continue. My efforts since my dismissal have been focused on finding and fixing the root of the problem to ensure that this could never happen again throughout my professional career. I have been very successful in doing so. Although I do not expect to ever have to make any further changes to my medications, if the need to make a change ever arose, I would use the pharmacokinetic profile of the medication(s) I use to ensure that the therapeutic concentrations I need are quickly reached and are steadily maintained throughout the day. This would have prevented what happened with Mydayis, as its pharmacokinetic profile would have made it obvious ahead of time that it is much too slow to reach therapeutic levels to meet my needs. I want to stress that I am not using my ADHD as an excuse, but rather as an explanation for what happened. Excuses put the blame on others, but explanations allow us to take responsibility while still solving problems, because we must first explain a problem to be able to fix it.

My understanding of the problems I encountered during PA school is comprehensive. I already know for sure that the dosing change will work to resolve those problems, and I know exactly why. Expressing the full extent of my understanding of all of this in writing is not realistically feasible. There is a lot of information that is pertinent, and not all aspects of my circumstances are appropriate to address in writing, especially given the personal nature of these issues. To the best of my ability, I have addressed the points that I believe are most important to a decision on my readmission while not including so much detail as to dilute the message that was intended. If there are any concerns I did not address, if any points require further clarification, or if any doubts remain that I understand the challenges that led to my dismissal and have resolved them, I encourage you to reach out to me and discuss those concerns. I am confident that I will be able to address them. I do not believe that it is necessary for the Academic Review Committee to understand all aspects of the problems I have had to the extent that I do. My goal is to assure the Academic Review Committee that I understand these problems, that I have successfully addressed them, and that I will succeed moving forward.

In light of the mitigating factors present for my performance during rotations #8 and #9 and my plan to address all concerns throughout the program, I believe that my case for readmission is compelling. By asking for readmission and for the chance to repeat rotations #8 and #9, I believe that I am not asking for a second chance, but rather for a first chance to succeed on these rotations while adequately medicated for my disability. I believe I deserve that first chance. My performance upon my return will quickly erase any doubts about my candidacy to be a PA and prove that a better solution for the medical management of my ADHD symptoms is all I needed to thrive.

I look forward to an opportunity to answer your questions and discuss this matter further. Thank you so much for considering my readmission. I hope to hear from you soon.

Sincerely,
John J. Devenney III

# Main Line Family Medicine

Tetyana Zelenska, MD

1450 E. Boot Road, Suite 200A

West Chester, PA 19380

610-344-9650

To Whom It May Concern:

I have been taking care of John Devenney since December of 2015. He has been treated for ADD with a combination of immediate and extended release Adderall.

John's Adderall regimen was switched to Mydayis (16-hour time-released version of Adderall) in December of 2017 for the purposes of improved sleep, longer duration of action, and decreasing the frequency of dosing during his busy day schedule.

After a one-month trial period, John called my office with concerns that Mydayis was not giving him adequate symptom relief. However, due to his rotation schedule, he was unable to come into the office when I was available, so we were unable to make adjustments before his dismissal.

In comparison to his old medication regimen, John's dose was much lower on Mydayis. With a certain degree of reasonable doubt, John's inattentiveness, lack of effort, and uncharacteristic under-performance is most likely related to incomplete control of his ADD symptoms.

If you have any questions, please do not hesitate to call.

Sincerely,

_____                    _____
Tetyana Zelenska, MD                                                    Date

4-12-2018

# EXHIBIT "D"



# ARCADIA
## UNIVERSITY

May 23, 2018

John Devenney
1405 Mill Creek Drive
West Chester, PA  19380

Dear Mr. Devenney:

I regret to inform you that your petition to be re-instated into the Physician Assistant Graduate Program at Arcadia University has been denied. The Committee reached this decision based on your academic record and related materials as well as information you provided.

Please be aware that there is no further option for appeal. I understand that you may well be disappointed with this decision but do wish you the best in your future endeavors.

Sincerely,

Nancy Rosoff, Ph.D.
Dean of Graduate and Undergraduate Studies

NR/mkm

Cc: Diana Noller, Academic Adviser
    Bill Elnick, Registrar
    Scott Rosen, Business Office

OFFICE OF GRADUATE STUDIES

TEL: 215-572-2925 • FAX: 215-572-2081 • WWW.ARCADIA.EDU | 450 S. EASTON ROAD, GLENSIDE, PA 19038-3295
A DISTINCTIVELY GLOBAL, INTEGRATIVE, PERSONAL LEARNING EXPERIENCE

# EXHIBIT "E"



August 8, 2018

**VIA EMAILTO:  jsargent@lambmcerlane.com**
**AND FIRST CLASS MAIL**

James C. Sargent, Jr., Esquire
Lamb McErlane PC
24 E. Market Street
P.O. Box 565
West Chester, PA 19381

Re:  John Devenney

Dear Mr. Sargent:

I have received your letter dated July 27, 2018. After reviewing materials related to the dismissal of John Devenney, the University has discovered that Mr. Devenney was not provided an opportunity to compete the appeals process. This occurred due to a staff error. The letter of May 23, 2018 letter stating that there was no further option for appeal was incorrect; he is entitled to appeal the PA program's decision at the University level.

Should Mr. Devenney wish to appeal the program decision, he should write a letter to that effect, explaining the reason for his appeal, and send it to Dr. Rosoff via email (rosoffn@arcadia.edu), with a copy to Associate Dean Mary Kate McNulty (mcnulty@arcadia.edu) no later than November 26, 2018. If Mr. Devenney pursues an appeal, the committee considering such appeal will have a copy of the letter he sent to the PA program on April 23, 2018. Please note that the committee generally wants to see additional relevant information beyond what was included in the initial appeal.

In the event Mr. Devenney appeals to the University level, an appeal will be scheduled as soon as possible. Appeals are heard when the University is in session and the faculty members of the committee are on campus. Had an appeal been filed after receipt of the May 23, 2018 letter, it would not have been heard until the fall semester was underway; thus, this delay does not jeopardize Mr. Devenney's appeal.

James C. Sargent, Jr., Esquire
August 8, 2018
Page 2 of 2

Please ensure that any further communications from your office are directed to my attention, rather than directly to Dr. Rosoff.

Very truly yours,

Margaret M. Callahan
Interim General Counsel

cc:     Dr. Nancy Rosoff, Dean, Graduate and Undergraduate Studies
        Ms. Mary Kate McNulty, Associate Dean of Graduate Studies

# EXHIBIT "F"



ARCADIA UNIVERSITY
COLLEGE OF HEALTH SCIENCES

September 7, 2018

Dear Mr. Devenney:

This letter reiterates the discussions Michael Huber and I had with you on February 12, 2018, when we explained the reasons for your dismissal from Arcadia University's Physician Assistant program. Your dismissal followed concerns raised by the Family Practice and Surgical preceptors with whom you had clinical rotations, who felt that you demonstrated an inadequate fund of knowledge, poor clinical assessment skills and a lack of professionalism. Those evaluations echoed concerns raised with you during the didactic phase of the program, including the following:

1. <u>Fund of knowledge</u>: Your GPA was slightly above 2.7, the minimum necessary to avoid academic probation. Despite concerns raised by the faculty about your academic performance, you failed to embrace their recommendations. In June 2016, Professor Brasel encouraged you to utilize accommodations provided through the Office of Disabilities, but you stated that you did not need accommodations. Robert Nadratowski also recommended that you seek help with Disability Services, but you indicated that your home services were better than what the University could provide. In December 2016, Professor Brasel offered study tips for improving your exam performance. In January 2017, Professor Myers spoke to you about your grades and made recommendations, at which time you questioned whether you wanted to continue in the program.

2. <u>Clinical assessment skills</u>: You struggled with assessing patients and formulating diagnoses. In September 2017, Professor Myers offered help to address your poor performance with the formative OSCE. You also needed to rewrite a Physical Diagnosis assignment due to poor performance.

3. <u>Professionalism</u>: You demonstrated a lack of professionalism and poor judgment throughout your time in the program, beginning in the Summer 2016 semester. At the outset of the program, you asked to be excused from attending lectures despite the program's mandatory attendance policy, which you were informed of as early as your interview as an applicant and which was reiterated upon your matriculation into the program. Even after you were informed that attendance was required, you were repeatedly late and/or left early. Rather than engaging in respectful educational discourse, you challenged the faculty's knowledge base. When this unprofessional communication was discussed with you, you admitted this had been a pattern of behavior in previous academic

COLLEGE OF HEALTH SCIENCES



ARCADIA
UNIVERSITY
———— COLLEGE OF HEALTH SCIENCES ————

settings. In September 2017, you were notified of a professionalism infraction based on your continued failure to complete surveys for the spring semester.

In order to rectify these concerns, it was necessary for you to take action, rather than offer excuses. It was apparent in the feedback received from the clinical rotations in early 2018 that you had failed to do so. On January 25, 2018, you met with Professors Mike Huber and Jennifer Slota, to discuss the concerns raised by Dr. Vollmar about your knowledge, clinical assessments and professionalism during the Family Practice rotation. Professors Huber and Slota explained the need for you to take ownership of your conduct and learn from your transgressions. Despite that advice, you began the surgical rotation at the end of January, and immediately engaged in unreliable attendance. You attributed your tardiness and disengagement to the Super Bowl victory and the subsequent Eagles parade. Physician Assistants and other medical professionals must demonstrate a commitment to delivering patient care, even in the face of personal inconvenience and challenges.

Arcadia University's Physician Assistant Program is devoted to training highly competent physician assistants who will promote professionalism and foster excellent patient care. The program relies on collaboration between faculty and students to master the knowledge and skills required of the profession. Our faculty devoted extensive time to help you succeed in the program. Despite those efforts, you seemed unwilling to accept responsibility and make a commitment towards your own success. You attributed the events that led to your dismissal from the program to a change in medication that occurred during your clinical year. However, you struggled in several areas of the Program's Minimal Technical Standards for Admission, Continuance and Graduation, outlined to you in the *Policies and Competencies Handbook* and communicated to you upon matriculation into the program, throughout your time in the program. It was the result of your continued failure to meet the Technical Standards that you were dismissed from the program.

Regards,

Diana T. Noller, DHsc, MMS, MSPT, PA-C
Dept. of Medical Science Chair & PA Program Director
Arcadia University

COLLEGE OF HEALTH SCIENCES

# EXHIBIT "G"



# ARCADIA
## UNIVERSITY

December 17, 2018

Mr. John Devenney
1405 Mill Creek Drive
West Chester, PA 19380

Dear Mr. Devenney:

I regret to inform you that your petition to be reinstated into the Physician Assistant Graduate Program at Arcadia University has been denied. The Graduate Academic Standing and Appeals Committee reached this decision based on your academic record and related materials, as well as the information you provided.

Please be aware that there is no further option for appeal. I understand that you may well be disappointed with this decision but do wish you the best in your future endeavors.

Sincerely,

Nancy Rosoff, Ph.D.
Dean of Graduate and Undergraduate Studies
NR/mkm